250 P.3d 97 (2011)
STATE of Washington, Petitioner,
v.
Tyrone Dentyroll FORD, Respondent.
No. 83617-5.
Supreme Court of Washington, En Banc.
Argued September 23, 2010.
Decided March 31, 2011.
*98 Abigail E. Hurd, Clark County Prosecutor's Office, Vancouver, WA, for Petitioner.
Lisa Elizabeth Tabbut, Attorney at Law, Longview, WA, for Respondent.
C. JOHNSON, J.
¶ 1 This case asks us to determine whether, by orally instructing a jury that it must fill in a blank verdict form, a trial court improperly coerced the jury to reach a verdict. The Court of Appeals concluded that the trial court's action coerced the jury, violating the defendant's right to a fair trial and thus meriting a new trial. In this case, because the jury had announced its unanimity prior to the judicial conduct at issue, we find no judicial coercion possible, and accordingly we reverse the Court of Appeals' decision and reinstate the defendant's conviction.

FACTS AND PROCEDURAL HISTORY
¶ 2 The State charged Tyrone Ford with two counts of child rape based on two occasions when he allegedly had sex with a minor, L.A.K., in August and September 2006. Clerk's Papers (CP) at 19. After both sides rested at trial, the jury retired to deliberate at 7:47 p.m. and returned with its verdict at 2:01 p.m. the next day. CP at 79; VI Verbatim Report of Proceedings (VRP) at 433. Then, the following occurred:
THE COURT: Will the presiding juror please rise. Has the jury reached a unanimous verdict?
THE PRESIDING JUROR: Yes.
THE COURT: Would you pass the verdict forms to my bailiff, and then you may be seated, sir.
Gentlemen, I'll dispense with the reading of the caption heading.
"We, the jury, find the defendant, Tyrone Ford, guilty of the crime of Rape of a Child in the Third Degree as charged in Count Two."
(Pause; reviewing documents. 2:05 p.m.) Gentlemen, sidebar.
(Bench conference; not recorded.)
THE COURT: I'm sending the jury back to the jury room. Verdict form No. 1 is completely blank. It must be filled in. Please go with Dorothy.
. . . .

*99 (Jurors reenter courtroom. 2:09 p.m.)
THE COURT: Presiding juror, have you reached a verdict as to Count One?
THE PRESIDING JUROR: Yes.
THE COURT: Was it a unanimous verdict?
THE PRESIDING JUROR: Yes.
THE COURT: Why don't you go ahead and give it to Dorothy, then.
(Pause; reviewing document.) Okay, as to Count One:
"We, the jury, find the defendant, Tyrone Ford, guilty of the crime of Rape in the Second Degree as charged in Count One."
IV VRP at 389-92; VI VRP at 434. The jurors were then individually polled and each confirmed the verdict. Nothing in the record indicates that any juror expressed any disagreement with either verdict during polling.
¶ 3 This was relatively short. The sidebar occurred at 2:05 p.m., and the jury returned by 2:09 p.m. VI VRP at 434. After sending the jury back, the trial court considered the possible explanations for the blank form: the jury may have forgotten to fill out the form, they were deadlocked on count one, or they reached a "not guilty" verdict on count one. IV VRP at 391. The court decided to advise the jurors that if they had any questions, they should submit them to the court. But before that advice could be relayed, the jury returned with a unanimous guilty verdict on count one. Ford did not object to any of these events or instructions.
¶ 4 Ford appealed his conviction, arguing that, among other things, the trial court erred by directing the jury to fill out the verdict form for count one. The Court of Appeals, in a split decision, reversed Ford's conviction for count one, concluding that the trial court's instruction to the jury regarding the verdict form was a manifest constitutional error that was substantially likely to have affected the outcome of Ford's trial. State v. Ford, 151 Wash.App. 530, 540-41, 213 P.3d 54 (2009).
¶ 5 We granted the State's petition for review. State v. Ford, 168 Wash.2d 1005, 226 P.3d 781 (2010).

ISSUE
¶ 6 Did the trial court's instruction that the jury must fill out the blank verdict form constitute coercion and thus violate the defendant's right to a fair trial?

ANALYSIS
¶ 7 Appellate courts typically will not consider an issue raised for the first time on appeal. RAP 2.5(a); State v. Kirkman, 159 Wash.2d 918, 926, 155 P.3d 125 (2007). However, an error may be raised for the first time on appeal if it is a manifest error affecting a constitutional right. RAP 2.5(a)(3). To demonstrate such an error, the defendant must show that the error actually prejudiced his rights at trial. Kirkman, 159 Wash.2d at 926, 155 P.3d 125. A claim of judicial coercion affecting a jury verdict is such an error that we will review, and our analysis is guided by precedent.
¶ 8 To prevail on a claim of improper judicial interference with the verdict, a defendant "must establish a reasonably substantial possibility that the verdict was improperly influenced by the trial court's intervention." State v. Watkins, 99 Wash.2d 166, 178, 660 P.2d 1117 (1983). This requires an affirmative showing and may not be based on mere speculation. We consider the totality of circumstances regarding the trial court's intervention into the jury's deliberations. Watkins, 99 Wash.2d at 177-78, 660 P.2d 1117; State v. Boogaard, 90 Wash.2d 733, 739-40, 585 P.2d 789 (1978). Before we can do so, the defendant must first establish that the jury was still within its deliberative process.
¶ 9 Ford has not made this threshold showing, and so he cannot show the type of influence or coercion necessary to establish that the court improperly influenced the jury's verdict. Nothing in the record before us suggests that the jury was deadlocked or experiencing any difficulty in reaching a decision. What we have is the opposite. The jurors twice indicated their unanimity.[1] The *100 jurors were polled. Each juror affirmed agreement with the verdict. There is no room for judicial coercion or influence because, as the record shows, the jurors had reached their verdict. And as far as the end result of completing the verdict form, they could just as conceivably returned a "not guilty" verdict.
¶ 10 The Court of Appeals' majority analogized the facts of Ford's case to those in Boogaard, a case that did, in fact, involve a deadlocked jury being interrupted in its deliberations and coerced by the court to reach a verdict. The jury in that case began its deliberations in midafternoon, and when no verdict had been rendered by 9:30 p.m., the judge sent the bailiff to inquire about the jury's status. The indication was that its vote at that time was 10-2. The judge then summoned the jury to the courtroom and proceeded to ask each juror, one by one, whether the jury could reach a verdict in half an hour. All but one juror responded affirmatively, and after returning to deliberations, the jury, not surprisingly, reached a verdict within the half hour time frame. We reasoned that by questioning each juror individually, the judge made clear his preference that they reach a verdict within a half-hour, thus improperly interfering in the deliberative process and coercing them into reaching a verdict. Boogaard, 90 Wash.2d at 733-39, 585 P.2d 789. Here, the Court of Appeals' majority opined that a similar coercion occurred; by directing the jury to fill out the blank verdict form, the trial court coerced the jury into reaching a verdict.
¶ 11 The Court of Appeals' analogy is misplaced. Here, unlike in Boogaard, there was no judicial interruption of deliberations. Deliberations had ended, which we know, because the jury indicated its unanimity before the judge sent the jury back to fill out the verdict form. The court asked if the jury had reached a "unanimous verdict," and the presiding juror responded that they had. Judge Wulle did not specify to which count he referred, so if the jury was hung on one count, it is very likely they would have said so. When the jury returned, the court again asked if the jury had reached a unanimous verdict. Following the reading of the verdict on count one, each juror was individually polled and confirmed agreement. Thus, unlike in Boogaard, here we are not presented with the obvious effects of judicial influence in the jury's deliberations.
¶ 12 Next, Ford argues, and the Court of Appeals agreed, that the trial court in this case violated CrR 6.15(f)(2), which prohibits a trial court from suggesting to a jury that it must reach an agreement. That rule provides:
After jury deliberations have begun, the court shall not instruct the jury in such a way as to suggest the need for agreement, the consequences of no agreement, or the length of time a jury will be required to deliberate.
CrR 6.15(f)(2). Ford contends that the trial court violated this rule by instructing the jury that the verdict form for count one "must be filled in." He argues that because the verdict form specified that the blank should be filled in with either "guilty" or "not guilty," the court's instruction to fill in the form effectively commanded the jury to agree unanimously one way or the other, when the blank verdict form they had returned was an appropriate and acceptable verdict. This argument begs the question. Here, the indication was that the jury had reached a unanimous verdict and this shows deliberations were complete. Because the jury had finished its deliberations, CrR 6.15(f), titled "Questions from Jury During Deliberations," has no application.
¶ 13 Ford urges us to consider the time the jury spent filling out the verdict form as evidence of further jury deliberation. Ford insists that because the jury was away for five minutes, when it should have taken only seconds to correct the error if it was *101 indeed inadvertent, any hold-out jurors must have been pressured to vote with the majority. There are three obvious problems with Ford's argument. First, this short time frame suggests the opposite: there were no further deliberations, which is consistent with the jury's announcing a unanimous verdict. Second, this would also suggest the presiding juror was misleading the court when asked if the jury had reached a unanimous verdict and the presiding juror twice responded affirmatively. Third, the jurors were individually polled following the verdict delivery and each affirmed the verdict as his or her own. Moreover, pointing to the short time frame is not the affirmative showing that Ford conceded at oral argument he would need to make, but instead requires speculation regarding the jury's deliberations.[2] While we can imagine some instances where a greater period of jury absence may indicate further deliberations, we expect it would be coupled with a directive from the court to reach agreement or a suggestion of a time limit for deliberations, such as occurred in Boogaard. It remains Ford's burden to show the jury was undecided when sent back to the jury room, and he has not made this showing.
¶ 14 The Court of Appeals' majority concluded that the trial court's oral instruction to the jury conflicted with the written jury instructions by suggesting the need for agreement. However, review of the written instructions demonstrates that the trial court's instructions merely restated instructions the jury had already been given in written form. As both Ford and the Court of Appeals' majority observed, the written jury instructions stated that the jury "need not unanimously agree. . . ." CP at 34. But the written instructions also informed the jury that it "must fill in the blank provided in each verdict form the words `not guilty' or the word `guilty' . . ." CP at 35. This written instruction appears to impart the same meaning as the trial court's oral instruction that verdict form one "must be filled in." Ford cannot argue that the written instructions improperly coerced the jury into agreeing, so it is hard to see how the court's oral instructionwhich was substantively identical to the written instructioncould have done so.
¶ 15 Finally, Ford argues that juries are presumed to follow the instructions provided. E.g., State v. Ervin, 158 Wash.2d 746, 756, 147 P.3d 567 (2006). Ford contends that the return of a blank verdict form shows the jury was following instruction 12, which included, as mentioned above, that the jury need not unanimously agree that all acts were proved. But Ford's argument conflicts with the jury's representation of reaching a unanimous verdict. Furthermore, another instruction, which we also presume the jury followed, stated that "you should not change your honest belief as to the weight or effect of the evidence solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict." CP at 24. Rather than pick and choose which instruction we feel the jury followed, we presume the jurors followed all instructions and were being honest both when it announced a unanimous verdict and when each was individually polled as to that verdict.

CONCLUSION
¶ 16 Judicial coercion must include an instance of actual conduct by the trial judge during jury deliberations that could influence the jury's decision. To make such a claim, a defendant must first make a threshold showing that the jury was still within its deliberative process. Second, though related, the defendant must affirmatively show that the jury was at that point still undecided. Third, the defendant must show judicial action designed to force or compel a decision, and fourth, the impropriety of that conduct. Finally, if raised for the first time on appeal, a defendant must show that such interference rises to the level of manifest error, such that it actually prejudiced the constitutional right to a fair trial. No such showing has been established in this case. Accordingly, we *102 reverse the Court of Appeals' decision and reinstate Ford's conviction.
WE CONCUR: GERRY L. ALEXANDER, SUSAN OWENS, and JAMES M. JOHNSON, Justices.
MADSEN, C.J. (concurring).
¶ 17 Tyrone Ford's relief depends on whether he can "establish a reasonably substantial possibility that the verdict was improperly influenced by the trial court's intervention." State v. Watkins, 99 Wash.2d 166, 178, 660 P.2d 1117 (1983). I agree with the dissent that we cannot resolve this case on the ground that the jury was finished deliberating. However, given that the jury returned less than five minutes after the judge sent the jurors back to complete deliberations, the jury reached a unanimous verdict, and the jurors were polled individually, I agree with the lead opinion that Mr. Ford has not met his burden to establish improper judicial influence on the jury in reaching its verdict.
I CONCUR: MARY E. FAIRHURST, Justice.
STEPHENS, J. (dissenting).
¶ 18 According to the lead opinion, Tyrone Ford's trial was over once the trial court asked, "Has the jury reached a unanimous verdict?" and the presiding juror responded, "Yes." Verbatim Report of Proceedings (VRP) (Aug. 29, 2007) at 390. Though the jury was not at this point polled and the court had not yet accepted its verdict, the lead opinion concludes, "Deliberations had ended, which we know because the jury indicated its unanimity before the judge sent it back to fill out the verdict form." Lead opinion at 100. From this mistaken premise, the lead opinion reasons that the trial court's instructions to the jury could not have influenced the deliberations because the deliberations were over.
¶ 19 The lead opinion compounds its error by misreading the jury instructions to entirely foreclose the possibility that the jury could leave the verdict form blank on a particular charge. While the written instructions clearly allowed for this result, the trial court verbally instructed the jury that it had more work to do, stating, "Verdict form No. 1 is completely blank. It must be filled in." VRP (Aug. 29, 2007) at 390. Having given the jury this additional direction, the trial court sent the jury back for what can only be described as further deliberations.
¶ 20 Because I agree with the Court of Appeals that the trial court's actions present a reasonably substantial possibility that the verdict was improperly influenced, I respectfully dissent.

ANALYSIS

I. Standard of Review for Improper Judicial Influence
¶ 21 I agree with the lead opinion that Mr. Ford's claim of improper judicial influence is a "manifest error affecting a constitutional right" reviewable under RAP 2.5(a)(3). Lead opinion at 99.[1] I also agree that our analysis is guided by precedent. Id. Under State v. Watkins, 99 Wash.2d 166, 178, 660 P.2d 1117 (1983), a defendant demonstrates improper judicial influence by "establish[ing] a reasonably substantial possibility that the verdict was improperly influenced by the trial court's intervention." The lead opinion mentions the Watkins standard at the outset but does not apply it. Instead, it imposes on Mr. Ford a burden to establish improper judicial influence by showing "judicial action designed to force or compel a decision." Lead opinion at 101 (emphasis added). No authority is cited for this standard because none exists. A party challenging a verdict need not demonstrate intentional misconduct on the part of the judge. Nor does our precedent prohibit only force or compulsion; improper influence can come in many forms that do not rise to that level of judicial encroachment.
*103 ¶ 22 The lead opinion also requires a threshold showing "that the jury was still within its deliberative process" and "that the jury was at that point still undecided." Id. Drawing from the factual context of State v. Boogaard, 90 Wash.2d 733, 585 P.2d 789 (1978), the lead opinion essentially requires an affirmative showing that the jury was undecided when the trial court intervened. Lead opinion at 99-100, 101-102. Again, no authority is cited for these new requirements. Requiring parties challenging a verdict to make a threshold showing that the jury was still deliberating is completely unnecessary. It is no more meaningful than requiring appellants asserting trial error to make a threshold showing that there was a trial below. More importantly, requiring defendants to show that the jury was actually undecided at the time of the allegedly improper conduct has no place under Watkins. A judicial officer could certainly assert improper influence over the jury's deliberations even when the jury has not sent out questions or is otherwise in apparent unity. Nor is it clear how the court could determine whether the jury was undecided without making a specific inquiry. Rather than stray from our well-settled precedent, I would adhere to Watkins as the correct standard for assessing improper judicial influence.[2]

II. Jury Deliberations
¶ 23 The lead opinion concludes that Mr. Ford's claim of improper judicial influence must fail because, in its view, the jury had finished its deliberations before the court made the allegedly improper remarks. According to the lead opinion, because the jury was done deliberating, any comment by the court could have had no influence on the jury's verdict. The lead opinion's assertion that the jury had finished deliberating is puzzling in light of the fact that the trial court refused to accept the jury's verdict and sent the jury back to the jury room to continue deliberations. What more is needed to establish that the jury was not done deliberating? The lead opinion's assertion, however, provides the crux of its entire argument and therefore warrants a more detailed analysis.
¶ 24 We have long recognized that a jury is not done deliberating until the court accepts the verdict and the jury is discharged. See State v. Badda, 68 Wash.2d 50, 60-62, 411 P.2d 411 (1966); see also State v. Robinson, 84 Wash.2d 42, 46, 523 P.2d 1192 (1974) ("[A] jury's action does not become a verdict until it is finally rendered in open court and received by the trial judge."); Haney v. Cheatham, 8 Wash.2d 310, 325, 111 P.2d 1003 (1941) ("The court's right to send the jury back to consider further of its verdict is not ended until the verdict has been accepted and filed."); Beglinger v. Shield, 164 Wash. 147, 152, 2 P.2d 681 (1931) ("Until a verdict is received and filed for record, the trial court may send the jury back to consider and clarify or correct mistakes appearing on the face of the verdict."); Bino v. Veenhuizen, 141 Wash. 18, 22, 250 P. 450 (1926) ("Until a verdict is reached and the jury discharged its action is not final.").
¶ 25 Badda is instructive. The defendant there was tried on two counts of robbery. The jury announced it had reached a verdict late in the evening and was brought into the courtroom. The court clerk read the verdict form, which indicated the jury had found the defendant guilty of two counts of second degree burglary. The court immediately recognized it had given the jury the wrong verdict formsecond degree burglary instead of robberyat which point the court gave the jury the correct form for robbery and sent the jury back "`for further deliberation.'" Badda, 68 Wash.2d at 59, 411 P.2d 411. A short time later, the jury returned with a guilty verdict on both counts of robbery. On review, we found no error in the proceedings, noting that the first verdict "was never filed" and that the jury therefore continued in its deliberative capacity until the corrected verdict form was completed. Id. at 60-61, 411 P.2d 411.
¶ 26 In Beglinger, the jury returned a unanimous verdict awarding damages to the plaintiff. The jury was polled to confirm its unanimity. The court then excused the jury. *104 Before any jury members left the jury box, however, one of the jurors arose and attempted to clarify the jury's damages award. The remaining jurors agreed that the verdict did not clearly reflect their intended award. The court advised the jury that it was powerless to send them back to the jury room to correct the verdict, as it had already polled the jurors to confirm their unanimity. On review, we held that the court erred in refusing to allow the jury to reconsider the verdict. We explained that "[u]p to the time of the colloquy, the jury had not been discharged nor had the verdict been received or filed. The verdict had merely been read." Beglinger, 164 Wash. at 152, 2 P.2d 681.
¶ 27 The principle we can draw from these cases is that the jury continues to function in its deliberative capacity up to the point that the court accepts the verdict and the jury is discharged. This conclusion is consistent with statutes and court rules governing trial proceedings and the receipt of jury verdicts. For example, in situations where the jury returns a general verdict that is inconsistent with the jury's special findings of fact, the court can attempt to reconcile the inconsistency by "return[ing] the jurors to the jury room for further deliberations." RCW 4.44.440. Similarly, when a jury returns a unanimous verdict but polling reveals disagreement among individual jurors, "the jury may be directed to retire for further deliberations." CrR 6.16(a)(3); see also RCW 4.44.460 ("If the court determines that the verdict meets the requirements contained in this chapter and in court rules, the clerk shall file the verdict. The verdict is then complete and the jury shall be discharged from the case." (emphasis added)). These provisions plainly contemplate a jury that continues to operate in its deliberative capacity even after it returns a verdict that is read in open court. Cf. State v. Goldberg, 149 Wash.2d 888, 891-94, 72 P.3d 1083 (2003) (recognizing the jury can still be subject to improper influence even after indicating a unanimous verdict).
¶ 28 Here, there can be no doubt that the jury continued to function in its deliberative capacity at the time the trial court made the allegedly improper remarks. Although the presiding juror indicated that the jury had reached a unanimous verdict, the court refused to accept the verdict after reading the verdict form. The judge instead sent the jury back to the jury room for further deliberations. If the jury had in fact already concluded its deliberations, as the lead opinion contends, I fail to see any reason why the court would send the jury back to the jury room.[3]
¶ 29 Despite the jury's return to the jury room to continue deliberations, the lead opinion remains firm in its conclusion that deliberations had ceased based on the presiding juror's initial declaration that the jury had reached a unanimous verdict. This argument fails for several reasons. First, the presiding juror's declaration that the jury had reached "a unanimous verdict" is consistent with the verdict the jury returned. The jury had in fact reached a unanimous verdict, but only with regard to count II. When the court asked the presiding juror whether the jury had reached a unanimous verdict, the court did not specify which count it was referring to or whether it was referring to both counts. It asked an imprecise yes or no question. The presiding juror's response was also ambiguous. The lead opinion opines that if the jury had not reached a unanimous verdict on count I, it would have volunteered this information. Lead opinion at 100. But this is not an assumption we can entertain. Even the trial court recognized the ambiguity in the situation, noting that it was possible the jury could not reach a decision on count I and therefore intentionally left the verdict form blank. VRP (Aug. 29, 2007) at 391. Thus, the presiding juror's declaration of unanimity cannot be read to conclusively show the jury was unanimous on both counts.
*105 ¶ 30 Second, the lead opinion overstates the evidence in the record to conclude that the jury had reached a unanimous verdict on both counts. The lead opinion repeatedly says the jury declared its unanimous verdict twice and was polled to confirm its unanimity. Lead opinion at 99-100, 100-01. But in fact, before the court sent the jury back to the jury room to fill in the verdict form, the jury had declared its unanimity only through the presiding juror's one-word answer to the trial court's ambiguous question. And the jury was not polled at that point. It was only after the trial court instructed the jury to fill out the verdict form for count I and sent the jury back for further deliberations that the jury declared it was unanimous on count I and was polled.[4] The lead opinion's reliance on circumstances that did not occur until after the trial court's comments provides little insight into the jury's position before the comments were made. Nor is it helpful in deciding whether the comments impermissibly influenced the jury's deliberations.
¶ 31 Third, even assuming the presiding juror's declaration of unanimity applied to both counts, this does not render the verdict complete and thereby cut off the jury's deliberative process. As discussed above, a jury is not done deliberating until the court accepts the verdict and the jury is discharged. The jury's mere declaration of unanimity does not end the deliberations. See Beglinger, 164 Wash. at 152, 2 P.2d 681 (noting the verdict was not complete even after jury returned unanimous verdict and was polled); CrR 6.16(a)(3) (allowing further deliberations even after unanimous verdict declared when polling reveals lack of agreement). Certainly the presiding juror's initial declaration of jury unanimity would not have precluded individual jurors from changing their mind while deliberating back in the jury room.[5]
¶ 32 The flaw in the lead opinion's reasoning becomes apparent when considering how it might play out in a typical case. Imagine that, after advising the court it has reached a verdict, the jury returns to the courtroom and the presiding juror advises the court that the jury's verdict is unanimous. There is no evidence of disagreement or deadlock among the jury. At this point, under the lead opinion's approach, the verdict is complete and the jury deliberations have ended. The verdict is read in open court. The court then proceeds to poll the jurors individually. The polling reveals that two jurors are not in full agreement with the verdict. Under CrR 6.16(a)(3), the court instructs the jury to return to the jury room to continue deliberations. After several hours of delay, the jury informs the court it is hopelessly deadlocked and that further deliberations will be unavailing.
¶ 33 Under the lead opinion's approach, how is the court supposed to address this situation? If the verdict was complete when the jury initially declared its unanimity, can the court declare a mistrial based on the jury's later deadlock? What if, instead of indicating it is deadlocked, the jury returns with a unanimous verdict different from the one it initially announced was unanimous? Which verdict must the court accept? Such questions are not fantastical. They illustrate that the lead opinion's approach of declaring the jury's task done at the first intimation of jury unanimity makes little sense and raises practical concerns for trial courts attempting to clarify and resolve inconsistencies in jury verdicts. Our long-standing rule has been, and should remain, that jury deliberations do not end until the court accepts the verdict and the jury is discharged.[6]

*106 III. Improper Judicial Influence of Jury Deliberations
¶ 34 Because the jury was still in the deliberative process when the court returned the jury to the jury room, the question becomes whether the court's comments improperly influenced the jury's verdict under Watkins and CrR 6.15(f)(2). Turning first to CrR 6.15(f)(2), that rule provides that "[a]fter jury deliberations have begun, the court shall not instruct the jury in such a way as to suggest the need for agreement." We have explained that "[t]he purpose of this rule is to prevent judicial interference in the deliberative process." Boogaard, 90 Wash.2d at 736, 585 P.2d 789. Because we cannot know at what point in the deliberations individual jurors will reach their final decision, these protections must endure as long as the jury continues to operate in its deliberative capacity.
¶ 35 In this case, upon seeing the blank verdict form for count I, the court said, "I'm sending the jury back to the jury room. Verdict form No. 1 is completely blank. It must be filled in." VRP (Aug. 29, 2007) at 390. The written jury instructions required unanimous agreement in order to fill in the form and return a verdict. Clerk's Papers (CP) at 35. Thus, by telling the jury that the verdict form for count I "must be filled in," the court effectively required the jury to come to an agreement that Mr. Ford was guilty or not guilty. This removed from the jury the option of leaving the verdict form blank. This is an option to which the jury was entitled under the law, as we do not allow courts to essentially hold jurors hostage until they can come to a unanimous verdict. Simply put, under the written jury instructions and settled law, the jury had three options in terms of the decision it could reach: agree guilty, agree not guilty, or leave the form blank. But, after the court's comments, the jury had only two options to consider: agree guilty or agree not guilty. By removing the third available option from the jurythe option to leave the form blankthe court improperly interfered with the jury's deliberative process.
¶ 36 The lead opinion sees no harm in the court's comment, reading it as merely a restatement of the court's written instructions to the jury. Lead opinion at 101. The lead opinion highlights the written jury instruction stating that the jury "`must fill in the blank provided in each verdict form the words "not guilty" or the word "guilty". . . .'" Id. (quoting CP at 35). While at first glance this instruction and the court's comments appear similar, they are in fact critically different. The written instruction required the jury to fill in the verdict form "guilty" or "not guilty," but only if the jury came to a decision in the first place. This is evident from a reading of the entire instruction, including the last clause, which the lead opinion omits from its quotation: "You must fill in the blank provided in each verdict form the words `not guilty' or the word `guilty,' according to the decision you reach." CP at 35 (emphasis added). The instruction to fill in the verdict form therefore presupposed the jury had come to a unanimous decision of guilty or not guilty. But nothing in the jury instructions actually required the jury to fill in the form. A permissible way for the jury to indicate it was unable to reach a unanimous decision, for example, was to leave the verdict form blank. The court's verbal instruction materially differed from the written instructions because the judge categorically told the jury it had to fill in the verdict form for count I, which gave two options, "guilty" or "not guilty." This improperly suggested the obligation to reach a unanimous verdict in violation of CrR 6.15(f)(2), while the written instructions provided a correct statement of the law.[7]
¶ 37 The trial court's comments in this case implicate "the broader principle" we recognized in Watkins "that the jury must be free *107 from judicial pressure in reaching its verdict." 99 Wash.2d at 176, 660 P.2d 1117. Contrary to the lead opinion's view, Watkins does not require an affirmative showing of intentional judicial misconduct. Nor does it require a showing that the court forced the jury to reach a particular result. Here, the Watkins standard is met because the trial court's statements narrowed the options available to the jury during its deliberations by requiring a unanimous decision of guilty or not guilty, thereby presenting a "reasonably substantial possibility that the verdict was improperly influenced by the trial court's intervention." Id. at 178, 660 P.2d 1117.

CONCLUSION
¶ 38 Juries must be allowed to decide cases free from external influences. I would reaffirm our long-standing rule that the jury's deliberative process does not end until the verdict is accepted by the court and the jury is discharged. And I would hold that by requiring the jury to return to deliberations and come to a unanimous verdict of either guilty or not guilty on count I, the trial court in this case improperly influenced the jury's deliberations. I respectfully dissent.
WE CONCUR: TOM CHAMBERS, Justice and RICHARD B. SANDERS, Justice Pro Tem.
NOTES
[1] This is not to say, as the dissent suggests, that an initial indication of unanimity from the jury is conclusive proof that deliberations have ended, foreclosing all claims of judicial coercion. "`Until a verdict is received and filed for record, the trial court may send the jury back to consider and clarify or correct mistakes appearing on the face of the verdict.'" State v. Badda, 68 Wash.2d 50, 61, 411 P.2d 411 (1966) (quoting Beglinger v. Shield, 164 Wash. 147, 152, 2 P.2d 681 (1931)). Contrary to the structural definition of "deliberations" the dissent advances, a jury should be able to fix mistakes without judicial coercion being claimed in every instance.
[2] This court should not delve into the jury deliberation process. E.g., State v. Depaz, 165 Wash.2d 842, 854, 204 P.3d 217 (2009).
[1] The lead opinion makes this point early in its opinion, but in the last paragraph bewilderingly concludes that Mr. Ford's challenge to the verdict fails because, among other reasons, he has not shown manifest constitutional error. Lead opinion at 101-02. Notwithstanding this singleline conclusion, the lead opinion clearly resolves Mr. Ford's claim on the merits. So would I.
[2] The concurrence likewise agrees that Watkins furnishes the governing standard, though it concludes there was no improper influence in this case.
[3] We do not need to speculate about what actually took place in the jury roomfor example, whether the jury simply filled in the form for count I or whether there was last-minute lobbying of hold-out jurors. The Watkins standard does not require us to know, but instead examines the totality of the circumstances that do not inhere in a jury verdict to determine whether there is a reasonably substantial possibility of improper judicial influence. Watkins, 99 Wash.2d at 178, 660 P.2d 1117.
[4] It is not clear from the record that the jury was ever polled as to its verdict on count II. When the jury returned, the trial court asked only about its verdict on count I. VRP (Aug. 29, 2007) at 391-92.
[5] Almost as an afterthought, the lead opinion in a footnote acknowledges that a jury's initial indication of unanimity does not conclusively prove that deliberations have ended. Lead opinion at 99-100 n. 1 (citing Badda, 68 Wash.2d at 61, 411 P.2d 411). This acknowledgment is at odds with the entire premise of the lead opinion's argument, which rests on the conclusion that the jury in this case was done deliberating when it indicated its unanimity.
[6] The lead opinion mischaracterizes the dissent as suggesting that the trial judge cannot instruct the jury to "fix mistakes" without engaging in judicial coercion. Lead opinion at 99-100 n.1. However, it is perfectly appropriate for the judge to send the jury back for further deliberations after a polling of the jury reveals an apparent inconsistency in its verdict. As explained in section III, the problem of judicial coercion arises if the judge suggests to the jury how it must act.
[7] If the lead opinion's reading of the trial court's written jury instructions were correct, the instructions themselves would violate CrR 6.15(f)(2) because they would require the jury to come to a unanimous decision and would foreclose any option of leaving the verdict form blank. See CrR 6.15(f)(2) (prohibiting the court from instructing the jury in a manner that "suggest[s] the need for agreement").